# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

PERCY GREEN, II,               )
                              )
       Plaintiff,        )
                              )
    v.                      )      No. 4:06CV1667RWS
                              )
STATE OF MISSOURI, et al.,     )
                              )
       Defendants.       )

## MEMORANDUM AND ORDER

In a thirteen count complaint,[1] Plaintiff Percy Green, II has sued more than

twenty defendants for violations of his constitutional and statutory civil rights and

the Missouri common law.  All claims concern his arrest at a St. Louis City School

Board meeting on November 18, 2003 and his subsequent prosecution.  In three

separate motions, the defendants have moved for summary judgment.  In the first

motion, Defendants Michael Quinn, JoAnn Freeman Morrow, Julius Hunter, Chris

Goodson, and Francis Slay, as current or former members of the St. Louis Board

of Police Commissioners, Secretary Paul Nocchiero, and Chief of Police Joseph

Mokwa, as well as individual officers David Doetzel, Michael Regan, Andrew

Griffin, Daniel Peek, John Podolak, and Brent Knox jointly moved for summary

---

[1] The counts are numbered I, II, III, IV, IX, X, XI, XII, XIII, XIV, XV, XVI, and XVII.
The complaint does not contain counts numbered V, VI, VII, or VIII.

judgment.  In the second motion, Defendants Charles McCrary, Kestner Miller, and the Special Administrative Board of the Transitional School District of the City of St. Louis jointly moved for summary judgment.  And in the final motion, Defendants City of St. Louis, Francis Slay, as Mayor of the City of St. Louis, and two prosecutors, David Miller and John Bouhasin, jointly moved for summary judgment.  For the reasons stated below, I will grant summary judgment on some claims and deny judgment on others.

## I.    *Background*

Plaintiff Percy Green is a well-known civil rights activist in St. Louis. Green's long history of civil rights activism is discussed in the landmark employment discrimination case, <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 79 (1973).  Three decades after Green's civil rights activities reached the Supreme Court, Green became concerned about the actions taken by a new slate of candidates who were elected to the St. Louis School Board in the Spring of 2003. After being officially sworn in, the new School Board's actions caused an outpouring of anger in the district and swelled the number of people attending School Board meetings.  Green was one of the people who began attending School Board meetings, and his arrest at the November 18, 2003 School Board meeting gave rise to this lawsuit.

Green filed his initial complaint on November 17, 2006. Over the course of the last three and a half years, Green has amended his complaint four times. In its final iteration, Green seeks damages for his personal injuries, loss of employment and economic opportunities, personal embarrassment, damage to his reputation, litigation costs, and his sense of personal distress regarding "movement losses." In this case, the "movement loss" at issue is not Green's seizure at the School Board meeting or the loss of his freedom to move. Rather, Green asserts that he was damaged because the success of "the movement" was of great personal importance to him. He claims he is entitled to damages for the failure of "the movement" because after his arrest, attendance at meetings "dropped off."

Before discussing the claims Green has made and the evidence the parties have submitted in support of and in opposition to summary judgment, it is necessary to explain the difficulty the defendants and the Court have encountered in their attempts to understand what, exactly, Green's claims and legal arguments are. Green is represented by counsel, and I have asked Green for clarification. Green's memoranda and responses frequently lack clarity and generally do not assist me in understanding his claims or arguments. It appears Green has made the following claims.

In Count I, Green sues Charles McCrary and Kestner Miller ("School Security Officers") and David Doetzel, Michael Regan, Andrew Griffin, Daniel Peek, John Podolak, Brent Knox, Craig Hebrank, Daniel Sweeney, and Byron Willis ("Defendant Police Officers"),[2] for violation of Green's First, Fourth, Fifth, Eighth and Fourteenth Amendment rights in their individual capacities. It is not clear whether Green asserts this count against the Special Administrative Board of the Transitional School District of the City of St. Louis ("SAB") and the Police Department through its Chief of Police Joseph Mokwa, its Secretary Paul Nocchiero, and Board Members Michael Quinn, JoAnn Freeman Morrow, Julius Hunter, Chris Goodson, and Francis Slay, in their capacities as current or former members of the St. Louis Board of Police Commissioners ("Police Board").

In Count II, Green sues School Security Officers and Defendant Police Officers for violation of his statutory civil rights. Green alleges that School Security Officers and Defendant Police Officers engaged in intentional wrongful conduct and violence toward him, and they had no lawful authority to arrest him or use force against him. Green also claims the actions were done with actual malice

---

[2] Because Hebrank, Sweeney, and Willis are dismissed for failure to prosecute or for lack of service, discussed *infra*, my use of the term "Defendant Police Officers" throughout this order refers only to Doetzel, Regan, Griffin, Peek, Podolak, and Knox.

and with willful and wanton indifference to, and deliberate disregard, for Green's constitutional rights. Green seeks exemplary and punitive damages.

In Count III, Green sues the Police Board for violations of Green's constitutional rights. Green claims that the Police Department had a policy and practice to authorize, acquiesce to, and cover up the use of excessive force.[3] Green further assets the Police Department had a policy and practice of authorizing its officers to verbally abuse detainees, and that these policies and practices caused Green to experience a constitutional deprivation. Green also claims the Police Department failed to adequately train, direct, supervise or control Defendant Police Officers concerning the use of excessive force and verbal abuse.

In Count IV, Green alleges that Defendant Police Officers, School Security Officers, and the Police Department conspired to violate his constitutional and

---

[3] The complaint says it was the Police Department's policy "to cover up the use of excessive force despite the lack of probable cause to arrest or any actual violation which would justify the issuance of a ticket." This allegation, of course, does not make sense because a determination of whether or not the force used in effecting an arrest was excessive is unrelated to whether there was probable cause to effect the arrest. In their motion for summary judgment, members of the Police Board interpreted this claim to allege a policy that permits excessive force, and not a policy that permits arrests without probable cause. Green did not dispute this interpretation so I, too, will interpret this claim to mean a policy concerning the use of excessive force.

statutory civil rights in violation of 42 U.S.C. §§ 1981, 1983, 1985 and the Equal Protection and Privileges and Immunities Clauses of the Fourteenth Amendment.

The Complaint does not contain any counts numbered V through VIII.

In Count IX, Green asserts a claim against the Police Department for *respondeat superior* liability for the intentional torts committed by Defendant Police Officers.

In Count X, Green asserts another claim against the Police Department, through the Police Board, for *respondeat superior* liability for the intentional torts of Defendant Police Officers, specifically the use of excessive force in the line of duty. Green claims that because the Police Department expressly authorized the use of excessive force, he is entitled to exemplary damages for the malicious conduct of Defendant Police Officers.

In Count XI, Green asserts a claim for negligence against Defendant Police Officers and School Security Officers. Green claims that Defendant Police Officers and School Security Officers were negligent when they used excessive force against him.

In Count XII, Green seeks exemplary and punitive damages from Defendant Police Officers and School Security Officers because their negligent violence was

done with willful and wanton indifference to, and deliberate disregard for, human life and Green's rights.

In Count XIII, Green seeks damages from the Police Department for the negligence of Defendant Police Officers through the doctrine of *respondeat superior* because Defendant Police Officers' negligence was committed within the scope of their employment and was an approved custom and usage of, or was encouraged, or acquiesced to, by the Police Department.

In Count XIV, Green asserts that the Police Department was negligent in that it failed to provide adequate training, supervision and control of Defendant Police Officers, and that Green was injured as a result of that failure.

In Count XV, Green claims he is entitled to punitive and exemplary damages from the Police Department for its failure to adequately train and supervise Defendant Police Officers because the failure to do so constitutes willful and wanton indifference to, and a deliberate disregard for, human life and the rights of private citizens, including Green.

In Count XVI, Green asserts a claim of malicious abuse of process, false arrest, and false imprisonment against School Security Officers and Defendant Police Officers. Green claims School Security Officers and Defendant Police Officers used the criminal process against him in order to intimidate him and

dissuade him from asserting his rights, to cover up their own wrongdoing, and to avoid civil and criminal liability for their own acts. Green also claims School Security Officers and Defendant Police Officers falsely arrested him and falsely imprisoned him or caused him to be imprisoned.

In Count XVII, Green sues City of St. Louis, Francis Slay, as Mayor of the City of St. Louis, and two prosecutors, David Miller and John Bouhasin (collectively "City Defendants"), for malicious prosecution in violation of 42 U.S.C. §§ 1981, 1983 and 1985. Green claims David Miller, Bouhasin, Slay, and the City of St. Louis conspired to deprive him of his rights to free speech, free assembly, and equal protection under the United States Constitution by prosecuting him in retaliation for exercising his constitutional rights.

Green also repeatedly asserts that his Thirteenth Amendment rights were violated, but it is not clear under which count he brings his Thirteenth Amendment claim. Because it is a constitutional right, I will group it with his other constitutional claims in Count I.

*What occurred at the November 18, 2003 School Board meeting prior to Green's arrest*

Green attended a meeting of the St. Louis School Board on November 18, 2003. At that time, Green was sixty-eight years old. The meeting was held in the

auditorium at Carr Lane School.  Green testified that the auditorium was nearly full and "an enormous number of people" were present.  Among them were School Security Officers; both McCrary, the Director of Security for the St. Louis Public Schools, and Kestner Miller,[4] a School Safety Officer, were inside the auditorium during the meeting.  McCrary testified that due to recent acts of violence against board members at prior meetings, he was ordered to provide additional school security personnel and a contingent of St. Louis police officers at the November 18, 2003 meeting.  Kestner Miller testified that his duties were to provide security and maintain order, and he received all instructions from his supervisor, McCrary.  Several of Defendant Police Officers, namely Doetzel, Regan, Griffin, Podolak, and Knox, were stationed inside the building.  Peek, another Defendant Police Officer, was stationed outside the Carr Lane School on the street.

McCrary was aware of Green's prior civil rights activities and considered Green "a well known civil rights activist in the St. Louis area."  Before that night, Kestner Miller did not have personal knowledge of Green's history as a civil rights activist.  Doetzel, Regan, Griffin, Podolak, Knox, and Peek all testified that they were unaware of Green's history of civil rights activity.

_____

[4] Because more than one defendant has the surname Miller, I will identify them by their first and last names.

The November 18, 2003 meeting was contentious, and speakers were routinely interrupted by shouts from the audience. Green observed a lot of yelling. According to Green, the yelling was coming from "everywhere in the auditorium." Green heard yelling from his right, his left, behind him, and in front of him.

There is a factual dispute concerning Green's behavior at the meeting. Green states that he spoke during the public access time, but during other portions of the meeting, he did not make "any noise" louder than a conversational tone, and he did not "boo." Byron Clemens, a St. Louis Public School teacher, testified that he paid "close attention" to Green during the meeting. Clemens noticed outbursts during the meeting, but none of them were centered near Green. Clemens also testified that at no time did Green, in a public way, say or do anything boisterous, contentious, disruptive, or inappropriate. R. William Purdy, a former teacher and administrator in the St. Louis Pubic Schools, testified that Green was seated about 10 to 15 feet in front of him and to the right. Purdy witnessed many others speak out of turn, yell, boo, or otherwise interfere with the meeting, but Green was not seated with the people behaving that way. Purdy testified that due to his proximity to Green at the meeting, he can state "with certainty" that Green spoke only during the public comment portion of the meeting and did not boo or disrupt the meeting in any manner.

For purposes of this motion, Defendant Police Officers and Police Board agree that Green was not boisterous or disruptive. Other defendants, namely the School Security Officers and SAB, deny that Green comported himself quietly and calmly during the meeting. McCrary claims that he heard Green repeatedly make loud disruptive outbursts, but he is unable to remember the specific words Green spoke. McCrary also testified that he heard the School Board President, Darnetta Clinkscale repeatedly ask Green to refrain from making disruptive outbursts and that he, himself, made a personal request that Green stop his outbursts while School Board members were conducting their discussions. McCrary also testified that he did not ask any police officers to arrest Green, and he did not enter an agreement with any police officers or "named defendants" to arrest or prosecute Green.

It appears that Kestner Miller did not see or hear Green make any loud outbursts. When asked to state what comments or statements Green made during the meeting, Kestner Miller did not mention any loud outbursts. Kestner Miller did, however, witness others telling Green to be quiet. For example, Kestner Miller testified that he witnessed Clinkscale repeatedly ask Green to refrain from making verbal disruptions. Kestner Miller also testified that he witnessed McCrary ask Green not to make any outbursts. Kestner Miller testified that he did

not ask police officers to arrest Green, and he did not enter an agreement with any police officers or "named defendants" to arrest or prosecute Green.

There is also a factual dispute about what happened when School Security Officers approached Green. Green testified that the first "unusual" thing was that Kestner Miller approached him and told him he would have to leave. Green states that he responded, "Have to leave? Why am I asked – Why am I being asked to leave? I have every right to be at this meeting as anyone else. I'm a taxpayer. And so, therefore, I'm not leaving." Green testified that he believed Kestner Miller leaned down and said, "I'm asking you to leave again." Green states that he refused again and then noticed Kestner Miller's supervisor, McCrary, standing 35 to 50 feet away near a column to Kestner Miller's right. Green said Kestner Miller looked toward McCrary. Green then witnessed McCrary gesture with his left hand for someone in the back of the room to come forward, but Green could not see to whom McCrary signaled. Before McCrary made the gesture, Green had not seen any police officers that night, and no one had mentioned anything about the officers to him. After McCrary signaled, a police officer approached Green and ordered him to leave. Green testified that when he asked the officer why he was being asked to leave, the officer told him "they don't want you here." Green said

that he responded that he had a right to be at the meeting, the officer reiterated his request that Green leave the meeting, and Green was arrested shortly thereafter.

McCrary testified that he and Kestner Miller approached Green together to ask him to leave the auditorium. After Green refused, McCrary says he summoned the St. Louis City police officers and asked them for assistance in requesting Green leave the auditorium. According to Kestner Miller, when he approached Green and asked Green to refrain from making loud outbursts, Green responded, "you are full of bullshit." Kestner Miller states that St. Louis City police officers then asked Green to leave the auditorium.

The police report is consistent with Kestner Miller's testimony and supports portions of McCrary's testimony, but contradicts other portions. The report states that McCrary and Kestner Miller confronted Green on two occasions and asked him to refrain from any loud outbursts. According to the police report, McCrary did not ask the officers for assistance in requesting that Green leave the auditorium. Instead, the report states that after McCrary asked Green to leave, McCrary summoned officers Podolak and Doetzel and requested that Green be arrested for peace disturbance.

Other witnesses also testified about what happened in the moments before School Security Officers approached Green. Purdy testified that after he saw

Clinkscale signal to McCrary, a security officer approached Green and ordered him to leave. Purdy then observed McCrary signal to someone at the back of the room. Clemens testified that as Green sat in his seat quietly and doing nothing, Clinkscale signaled to McCrary, who nodded in agreement. Clemens saw another school security officer, who he later learned was Kestner Miller, approach Green. Clemens testified that Kestner Miller motioned to McCrary who beckoned two uniformed police officers.

*What the police officers knew at the time they arrested Green*

Five of Defendant Police Officers participated in Green's arrest at the School Board meeting: Regan, Doetzel, Griffin, Podolak, and Knox. Officer Peek testified that he was not present at the School Board meeting, and was instead stationed outside the building. Peek did not participate in removing Green from the meeting, and his only involvement in the incident was conveying Green to the Justice Center for booking after Green was brought to the police cruiser by the other officers. Peek testified that he did not come to an agreement with any other person concerning Green's constitutional rights and that his actions in driving Green to the Justice Center were not motivated by Green's race or civil rights activities. Peek claims his sole motivation was his assignment to convey any arrested person to the Justice Center.

Officers Regan, Doetzel, Griffin, Podolak, and Knox submitted nearly identical affidavits concerning their actions and knowledge before they arrested Green. They each testified that they were detailed to the School Board meeting due to recent disturbances at the meetings and were stationed outside the auditorium until summoned by McCrary, who advised the officers that Green "was disrupting the meeting by making loud oral outbursts and requested assistance in requesting Plaintiff to leave the auditorium." In their answers to Green's second set of interrogatories, Regan, Doetzel, Griffin, Podolak, and Knox each testified that they "ha[d] no specific recollection of any specific words being spoken by [Green] prior to his arrest." Regan, Doetzel, Griffin, Podolak, and Knox also testified that they had no knowledge of Green's conduct "other than the information provided by Mr. McCrary," and their actions in helping to arrest Green were not motivated by Green's race or civil rights activities, and were solely motivated by the information provided by McCrary. They each testified that they did not come to an agreement with any other officer or any person concerning Green's constitutional rights. The only difference among the affidavits was that Regan's affidavit noted that McCrary is African American.

Green disputes that Regan, Doetzel, Knox, Griffin, and Podolak were outside the auditorium. Green testified that he saw McCrary signal to the back of

the auditorium, but he did not see the group at the back of the auditorium. Clemens testified that he saw McCrary signal to the back of the room where police officers were standing. Purdy also testified that he saw McCrary signal to someone at the back of the room and then a uniformed officer immediately approached. Although there appears to be a factual dispute over whether the officers were stationed outside the auditorium or at the back, this dispute is not material because there is no evidence that the officers witnessed any of Green's conduct during the meeting.

*Facts relating to Green's "resistance" to arrest and the amount of force used in arresting Green*

Green testified that after he was told he was under arrest, an officer grabbed his arm. The officers had to use their own strength to handcuff Green because he went limp. The officers pulled Green to the floor and placed him on his stomach. His face never impacted the ground in any significant manner. Green said that when the officers placed him face down on the floor, it was painful, but he did not scream out. Green also testified that the officers began to pull and drag him out of the auditorium, and he was dragged approximately 30 to 50 feet out a side door to a police cruiser.

Purdy testified that a uniformed police officer yanked Green "violently" by his arm and out of his seat and "threw" Green on the floor. Clemens testified that, without warning, an officer "violently grabbed" Green by the arm and yanked him on to the floor. Another officer then helped to "violently" roll Green onto the floor. According to Clemens, the officers, joined by several other uniformed officers, "dragged" Green out the door.

Kestner Miller stated that Green held on to the side of his seat when the police officers asked him to leave. McCrary stated that Green "fell to the floor in what is known as 'Passive Resistance Mode' and placed his body in an outstretched rigid form, which caused the officers to have to carry him out of the auditorium." Clemens testified that "Green put up absolutely no resistance and there was no resistance in his hands to being handcuffed." Clemens explained that as officers "dragged" Green out, "Green was limp and did not kick or thrust his body or arms in any manner to resist or attack the police officers." Purdy testified that "Green made no action of resistance of any type." Green testified that he "just went limp" because he did not want the officers to claim that he had hit them or kicked them. None of the police officers testified that Green resisted them in any manner.

Green also submitted a video of the arrest that was shot by local St. Louis television station NewsChannel 5.   The video clip shows an officer and Green conversing and Green calmly waving his hand back and forth as if to say, "no." The officer then grabbed Green's left arm and began to pull Green from the chair. Another officer placed his hand on Green's back to assist in pulling Green from the chair.  The video also shows that Green did not actively resist.  There is no indication of any violence on the video.

Green testified that after he was out of the view of the auditorium, an officer tightened his handcuffs.[5]  Once Green reached the cruiser, Green stepped into the rear and sat on one of the benches.  Peek then drove Green to the Justice Center for booking.  During the ride to the Justice Center, which lasted about 5 or 10 minutes, Green sat alone in the rear of the van.  As he rode to the Justice Center, Green experienced 6 or 7 abrupt stops, but the stops did not cause him to fall or hit the inside of the cruiser.  Green testified that the abrupt stops caused the handcuffs to tighten.  Green could not see the road, and it was impossible for him to know why the driver was stopping.

---

[5] This portion of the record is unclear because page 68 of Green's deposition was not submitted.

The only physical injuries Green claims to have suffered are injuries to his wrists caused by the handcuffs. Green testified that his circulation was cut off and did not return for a couple of months. The handcuffs left a mark which ultimately receded, and Green never sought medical treatment for his alleged wrist injuries. Green also testified that he currently has no problems with his hands or wrists attributable to Defendant Police Officers' conduct.

*Facts concerning the prosecution of Green*

David Miller was the Attorney Manager in the City Counselor's Office assigned to the Municipal Courts. John Bouhasin was an Assistant City Counselor primarily assigned as a prosecutor in Municipal Court from November 2003 to December 31, 2005. Francis Slay was the Mayor of the City of St. Louis during all of 2003 to 2006.

After Green was arrested for peace disturbance, David Miller charged Green with peace disturbance and resisting arrest. David Miller testified that he based his decision to prosecute Green on information he was told by a police officer: that Green was disturbing a Board of Education meeting by "screaming, yelling, jumping up and down on tables," and he believed that amounted to peace disturbance. Bouhasin testified that the charges were improperly dismissed from a "call docket" on June 17, 2005.

Bouhasin testified that he decided to refile the charges against Green because there were witnesses that wished to testify and prosecute Green, and in Bouhasin's opinion, there were sufficient facts to pursue the charges. Green's attorney, Robert Reinhold, testified that when he asked David Miller about why the charges were refiled, David Miller answered, "The mayor wants us to refile them, and we do what the mayor wants." David Miller testified that the exchange between Reinhold and him did not occur. David Miller acknowledged that refiling charges was rare, and during his thirty years in the City Counselor's officer he had probably refiled charges less than fifteen times. Slay denies having personally communicated with David Miller or Bouhasin regarding Green's prosecution. Slay also denies requesting that David Miller or Bouhasin refile the charges against Green after they had been dismissed.

## II.    *Legal Standard*

In considering whether to grant summary judgment, a district court examines the "pleadings, the discovery and disclosure materials on file, and any affidavits." Fed. R. Civ. P. 56(c)(2). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Lynn v. Deaconess Medical Center, 160

F.3d 484, 486 (8th Cir. 1998).  When a genuine issue of material fact exists,

summary judgment should not be granted.

The party seeking summary judgment bears the initial responsibility of

informing the court of the basis of its motion and identifying those portions of the

affidavits, pleadings, depositions, answers to interrogatories, and admissions on

file which it believes demonstrates the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When such a motion is made

and supported by the movant, the nonmoving party may not rest on his pleadings

but must produce sufficient evidence to support the existence of the essential

elements of his case on which he bears the burden of proof.  Id. at 324.  In

resisting a properly supported motion for summary judgment, the nonmoving party

has an affirmative burden to designate specific facts creating a triable controversy.

Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1113 (8th Cir. 2004).

### III.    Discussion

Before analyzing the individual bases for summary judgment that the

various parties have raised, I will address Green's Fifth, Eighth and Thirteenth

Amendment claims brought against all parties, and any claim he brings under 42

U.S.C. § 1982.

Both the Fifth and Fourteenth Amendments to the United States Constitution contain Due Process Clauses. The Fifth Amendment Due Process Clause limits the actions of the federal government, and a plaintiff may sue for violations under <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971). The Fourteenth Amendment Due Process Clause applies to state action, and a plaintiff may sue for violations under 42 U.S.C. § 1983. In this case, all defendants were state or municipal officials, and none were federal officials. Because the Fifth Amendment Due Process Clause applies only to federal action, and no defendants are federal actors, I will grant judgment on Green's Fifth Amendment claims as to all defendants.

I will also grant judgment to all defendants on Green's Eighth Amendment claims. The Supreme Court has made explicit "that *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the <u>Fourth</u> Amendment and its 'reasonableness' standard." <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989) (emphasis in original). After a conviction, "the Eighth Amendment . . . serves as the primary source of substantive protection to *convicted prisoners* in cases . . . where the deliberate use of force is challenged as excessive and unjustified." <u>Whitley v. Albers</u>, 475 U.S. 312, 327 (1986)

(emphasis added).  Green was not convicted of any of the charges arising from his November 18, 2003 arrest.  The parties do not dispute that the only force used against Green was during his arrest and transportation to the police station.  As a result, all defendants are entitled to judgment on Green's Eighth Amendment claims.

Green also alleges that the defendants have deprived him of his Thirteenth Amendment rights.  Section one of the Thirteenth Amendment provides, "Neither slavery nor involuntary servitude, except as punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."  While primarily directed at the enslavement of Blacks in the southern states, the Thirteenth Amendment applies to all compulsory servitude.  The Amendment extends beyond slavery and applies to cases where involuntary service is compelled by the use or threatened use of physical or legal coercion.  United States v. Kozminski, 487 U.S. 931, 948 (1988).  In this case, there is no evidence that Green was compelled to labor for defendants or that defendants intended to force Green, through physical or legal coercion, to serve them.  As a result, I will grant judgment to all defendants on Green's claims under the Thirteenth Amendment.  Additionally, to the extent that Green assert claims under 42 U.S.C. § 1982, I will grant judgment to all defendants because there is no

evidence that Green was denied the right "to inherit, purchase, lease, sell, hold, and convey real and personal property."

I turn now to the individual motions for summary judgment filed by the various defendants.

### A.    *Claims Green brings against Defendant Police Officers*

#### 1.    *Fourth Amendment Claims*

Defendant Police Officers argue that Green's Fourth Amendment Unlawful Arrest claim under 42 U.S.C. § 1983 fails as a matter of law because the officers had probable cause to arrest Green for peace disturbance and resisting arrest. They  also argue that, even if they lacked probable cause to arrest Green, they are entitled to qualified immunity because they did not violate any clearly established constitutional right.  Defendant Police Officers argue that Green's Fourth Amendment Excessive Force claim under 42 U.S.C. § 1983 fails as a matter of law because the officers used reasonable force, and they are entitled to qualified immunity because right to be free from the *de minimis* force applied to Green was not clearly established.

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would

have known." Pearson v. Callahan, 129 S. Ct. 808, 815 (2009). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id. Officials are not entitled to qualified immunity if "(1) the facts, viewed in the light most favorable to the plaintiffs, demonstrate the deprivation of a constitutional right; and (2) the right was clearly established at the time of the deprivation." Baribeau v. City of Minneapolis, 596 F.3d 465, 474 (8th Cir. 2010). Under current Supreme Court precedent, I may exercise my "sound discretion" to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id.

### a. Unlawful arrest

In Green's case, I believe it is most beneficial to first address whether the facts establish that Green was arrested in violation of the Fourth Amendment. The Fourth Amendment to the United States Constitution provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched." U.S. Const. amend. IV. "[A] police officer

may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony." United States v. Watson, 423 U.S. 411, 417 (1976). Similarly, a warrant is not required when an officer witnesses a criminal offense. "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001); Baribeau, 596 F.3d at 474; see also Virginia v. Moore, 128 S. Ct. 1598, 1607 (2008) ("[W]arrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution. . . ." ).

There is probable cause for an arrest when the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information are sufficient to warrant a prudent person in believing that the person arrested had committed or was committing an offense. Beck v. Ohio, 379 U.S. 89, 91 (1964). "Whether probable cause exists depends on the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of arrest." Baribeau, 596 F.3d at 474.

Probable cause is a "practical, nontechnical conception" and must be evaluated based on the totality of the circumstances. Illinois v. Gates, 462 U.S. 213, 231–232 (1983). "The substance of all the definitions of probable cause is a

reasonable ground for belief of guilt." Brinegar v. United States, 338 U.S. 160, 175 (1949). "A reasonable ground for belief means more than bare suspicion, but less than evidence which would justify condemnation or conviction." Baribeau, 596 F.3d at 474. "Probable cause exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." Brinegar, 338 U.S. at 175–76. In this case, each officer testified that he did not have any personal knowledge of the facts that would cause them to believe Green had committed an offense. Instead, they relied solely on information provided by McCrary. This requires me to analyze two separate issues: (1) whether the officers reasonably found the information McCrary provided them to be trustworthy and reliable; and (2) whether the information provided, if reliable, could establish probable cause that Green had committed a crime.

When analyzing the totality of the circumstances, "an informant's veracity, reliability, and basis of knowledge are all relevant and important factors." United States v. Palega, 556 F.3d 709, 714 (8th Cir. 2009). "The core question in assessing probable cause based on information supplied by an informant is whether the information is reliable. Information may be sufficiently reliable to

support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence." United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993).

The Missouri Attorney General claims that Clay v. Conlee, 815 F.2d 1164 (8th Cir. 1987), states that law enforcement officers are entitled to rely on information supplied by a *witness to a crime*, absent some indication that the information is not reasonably trustworthy or reliable. That is not a correct reading of Clay, however. The case states that law enforcement officers may rely on information supplied "by *the victim* of a crime, absent some indication that the information is not reasonably trustworthy or reliable." Id.; see also United States v. McKinney, 328 F.3d 993, 994 (8th Cir. 2003); Peterson v. City of Plymouth, 60 F.3d 469, 474–75 (8th Cir. 1995). This is because information furnished by a victim is generally considered to be reliable, and the "skepticism and careful scrutiny usually found in cases involving informants . . . is appropriately relaxed if the informant is an identified victim." Clay, 815 F.2d at 1168 (citing Easton v. City of Boulder, 776 F.2d 1441, 1449 (10th Cir. 1985)).

In this case, Defendant Police Officers did not receive any information from the victim of a crime, thereby making the Clay victim-identification bright-line

rule inapplicable to Green's situation. Instead, Doetzel, Regan, Griffin, Podolak, and Knox each indicated that their sole source of information about Green's alleged outbursts was McCrary, who advised them in person that Green was disrupting the meeting. When determining whether information provided by an informant is reliable, more weight is given to information when officers meet face-to-face with an informant and judge him to be credible. United States v. Wallace, 550 F.3d 729, 734 (8th Cir. 2008). Similarly, informants are considered more reliable and credible when they voluntarily contact law enforcement and provide their personal information. United States v. Bell, 480 F.3d 860, 863 (8th Cir. 2007). In this case, it is undisputed that McCrary met face-to-face with some of Defendant Police Officers and told them Green was making loud oral outbursts. The fact that McCrary contacted law enforcement in person and provided his personal information to the arresting officers suggests he should be considered a reliable and credible informant.

Having determined that the officers acted reasonably in finding the information provided to them by McCrary was reliable, I must now determine whether that information established probable cause that Green had committed or was committing a crime. Brinegar, 338 U.S. at 175–76. In this case, Defendant Police Officers argue they had probable cause to arrest Green for peace

disturbance and resisting arrest. Although Defendant Police Officers initially did not assert that they had probable cause to arrest Green for any other violations, upon my request for additional briefing, Defendant Police Officers argued they had probable cause to arrest Green for trespass.

The ordinances of the City of St. Louis make peace disturbance a misdemeanor offense. Section 15.36.030 of the St. Louis Municipal Ordinances, provides:

> Any person who shall disturb the peace of others by noisy, riotous or disorderly conduct, or by violent, tumultuous, offensive or obstreperous conduct or carriage, or by loud and unusual noises, or by seemly, profane, obscene, indecent, lewd or offensive language, calculated to provoke a breach of the peace, or by assaulting, striking or fighting another in any park, street, alley, highway, thoroughfare, public place or public resort within the City . . . so that others in the vicinity are disturbed thereby, shall be guilty of a misdemeanor.

Peace disturbance is also illegal under Missouri state law. Section 574.010 of the Missouri Revised Statutes provides:

> 1. A person commits the crime of peace disturbance if: (1) He unreasonably and knowingly disturbs or alarms another person or persons by (a) Loud noise; or (b) Offensive language addressed in a face-to-face manner to a specific individual and uttered under circumstances which are likely to produce an immediate violent response from a reasonable recipient; or (c) Threatening to commit a felonious act against any person under circumstances

which are likely to cause a reasonable person to fear that
such threat may be carried out; or (d) Fighting; or (e)
Creating a noxious and offensive odor; (2) He is in a public
place or on private property of another without consent and
purposely causes inconvenience to another person or
persons by unreasonably and physically obstructing: (a)
Vehicular or pedestrian traffic; or (b) The free ingress or
egress to or from a public or private place.

2. Peace disturbance is a class B misdemeanor upon the
first conviction.  Upon a second or subsequent conviction,
peace disturbance is a class A misdemeanor.  Upon a third
of subsequent conviction, a person shall be sentenced to
pay a fine of no less than one thousand dollars and no more
than five thousand dollars.

The Missouri courts have long "held that statutes abridging speech are

constitutional to the extent that they prohibit only that speech which is likely to

incite others to immediate violence."  State v. Carpenter, 736 S.W.2d 406, 408

(Mo. 1987).  Thus, a statute or ordinance must be construed only to prevent

"fighting words."  Id.  The Missouri Supreme Court has cautioned that "offensive

language can be statutorily prohibited only if it is personally abusive, addressed in

a face-to-face manner to a specific individual and uttered under circumstances

such that the words have a direct tendency to cause an immediate violent response

by a reasonable recipient."  Id.

Under Missouri law, "any statute or ordinance providing for punishment for a breach of the peace[6] is unconstitutionally broad and vague if by its terms a person could be punished for exercising his right to freedom of speech and assembly as protected by the First Amendment of the United States Constitution and guaranteed by the 14th Amendment." <u>City of Kansas City v. Thorpe</u>, 499 S.W.2d 454, 457 (Mo. 1973). An ordinance can only be upheld if it is "limited to punishment of acts or conduct inciting violence or intended to provoke others to violence." <u>City of St. Louis v. Tinker</u>, 542 S.W.2d 512, 515 (Mo. 1976). For nearly a century, the Missouri Supreme Court has held that a conviction for breach of the peace or peace disturbance for the use of "violent, tumultuous, offensive or obstreperous conduct or carriage, or by loud and unusual noises, or by unseemly, profane, obscene or offensive language" is invalid unless the conduct was found to be "calculated to provoke a breach of the peace." <u>City of St. Louis v. Slupsky</u>,162 S.W. 155, 157 (Mo. 1913). Simply disturbing "the peace by noisy, riotous and disorderly conduct" cannot qualify as a peace disturbance in Missouri. <u>Tinker</u>, 542 S.W.2d at 520. To constitute a crime, the conduct must have been calculated to provoke a breach of the peace, meaning it must have been intended to or

---

[6] "Breach of the peace" is a term that includes all violations of public peace or order and act tending to a disturbance thereof. <u>City of St. Louis v. Slupsky</u>, 162 S.W. 155, 157 (Mo. 1913).

reasonably likely to incite others to violence.  Id.; Slupsky, 162 S.W. at 157.  As

the Missouri Supreme Court explained in Tinker, "in Missouri it now is and

always has been the law that 'breach of the peace' unless otherwise defined in the

ordinance or statute using the term, refers only to acts or conduct inciting violence

or intended to provoke others to violence."  542 S.W.2d at 516.  For this reason,

peace disturbance statutes and ordinances, "insofar as verbal conduct is concerned

[only proscribe] verbal conduct which tends to excite immediate violence.

Loud speech, absent more, cannot constitute the crime of peace disturbance

under Missouri law.  In Tinker, a protester who screamed and yelled at police and

security guards, "pigs, or "stupid pigs," could not be found guilty of a peace

disturbance because the words were not intended to provoke others to violence.

Id. at 513–520; see also State v. Bickings, 90 S.W.2d 370 (Mo. Ct. App. 1995)

(reversing conviction for peace disturbance because the evidence was only that the

defendant "argued and yelled," and there was no evidence regarding the type of

language used); State v. Swoboda, 558 S.W.2d 24, 26 (Mo. 1983) (reversing

conviction for use of profane language and finding ordinance unconstitutional

because it was not "personally abusive, addressed in a face-to-face manner to a

specific individual and uttered under circumstances such that the words have a

direct tendency to cause an immediate violent response by a reasonable recipient").

It is therefore clear, that under Missouri law and the St. Louis ordinance, Defendant Police Officers had probable cause to arrest Green for peace disturbance based on his verbal conduct only if the "the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief" that Green's verbal conduct was calculated to provoke a breach of the peace or "intended to and was reasonably probable to incite others to violence." Brinegar, 338 U.S. at 175–76; Tinker, 542 S.W.2d at 520. The Missouri Supreme Court explained that the "conduct or language used by the speaker and its probable effect with respect to immediate violence must be viewed in the setting in which it occurs. The police officer who hears and sees the event take place must, of course, make some judgment as to whether the acts and conduct of the speaker, in the particular circumstances, is inciting violence or is intended to and reasonably probable that such acts and conduct will provoke others to violence." Tinker, 542 S.W.2d at 516.

In this case, Defendant Police Officers were stationed at the School Board meeting because there had recently been disturbances at meetings. Regan,

Doetzel, Podolak, Griffin, and Knox were summoned by McCrary who told them that Green was "disrupting the meeting by making loud oral outbursts."  Their informant, McCrary, stated in his answers to Green's interrogatories that Green's "exact actions" were "making loud oral outbursts that were disrupting the Board of Education meeting."  Regan, Doetzel, Podolak, Griffin, and Knox stated under oath that they had "no specific recollection of any specific words being spoken by Plaintiff prior to his arrest."[7]  McCrary, also stated under oath that he did not remember the "specific words" spoken by Green.  In light of these facts, and taking all reasonable inferences in Green's favor, the police officers believed Green's loud oral outbursts were words.

While there is evidence that Green told Kestner Miller, "you are full of bullshit," there is no evidence that this information was conveyed to Defendant Police Officers or that McCrary informed Defendant Police Officers that Green was speaking in a way that might incite others to violence.  Based on the evidence submitted, a reasonable officer would not be justified in believing Green's verbal conduct was calculated to provoke a breach of the peace or "intended to and was

---

[7]Michael Regan , David Doetzel, John Podolak, Andrew Griffin, and Brent Knox each used this identical language in their Answers and Objections to Plaintiff's second interrogatories. Daniel Peek answered in his Answers and Objections to Plaintiff's second interrogatories that he heard no comments or statements by Green.

reasonably probable to incite others to violence" as required by state law.  See

Tinker, 542 S.W.2d at 520.

Because Defendant Police Officers believed Green was simply "disrupting

the meeting by making loud oral outbursts" through words, and they did not

believe Green was using "fighting words," there was no probable cause to believe

Green's conduct violated the peace disturbance statute or ordinance.

Defendant Police Officers also argue that they had probable cause to arrest

Green for resisting arrest because, *after* Green was arrested, he resisted by going

limp.  This argument has no merit because it is undisputed that Green had already

been arrested, and therefore seized under the Fourth Amendment, at the time

Green went limp.[8]  It is therefore irrelevant whether they *later* developed probable

cause to arrest him.  Probable cause must exist *at the time of the arrest*.  Baribeau,

596 F.3d at 474.

At my request, the parties briefed the issues of whether Green's refusal to

leave the auditorium was a criminal infraction, whether Defendant Police Officers

---

[8]  Because Green was already seized at the point the officers claim they had probable
cause to arrest Green for resisting arrest, I do not address whether they did in fact have probable
cause to arrest Green for resisting arrest.  I note, however, that there are serious questions as to
whether the officers had probable cause to arrest Green for resisting arrest based on his passive
resistance.  Under the Missouri statute, a person can be guilty of resisting arrest only if he uses or
threatens the use of violence or physical force or by fleeing.  Mo. Rev. Stat. § 575.150.1.  There
are no allegations here that Green used or threatened force or fled.

had probable cause to arrest Green for an infraction other than peace disturbance, and, if there was probable cause to arrest Green for another infraction, whether Defendant Officers violated Green's Fourth Amendment rights for arresting him for the incorrect infraction. Supreme Court "cases make it clear than an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." Devenpeck v. Alford, 543 U.S. 146, 593 (2004); see also Whren v. United States, 517 U.S. 806 (1996). "That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." Devenpeck, 543 U.S. at 594.

In Devenpeck, law enforcement officers arrested Jerome Alford for violation of the Washington Privacy Act because he had been recording his conversations with the officers. Id. at 592. After arresting Alford, Devenpeck discussed a series of possible criminal offenses with prosecutors, including violation of the Privacy Act, impersonating a police officer, and making a false representation. Id. Devenpeck rejected the suggestion that he levy multiple charges against Alford because "the State Patrol does not, as a matter of policy, 'stack charges' against an arrestee." Id. A divided panel of the Ninth Circuit Court of Appeals held that the law enforcement officers "could not have had probable cause to arrest because they cited only the Privacy Act charge and tape

recording officers conducting a traffic stop in Washington." Id. at 593. The

majority held that, because impersonating a law enforcement officer and

obstructing a law enforcement officer were not "closely related" to the offense

Devenpeck invoked when he arrested Alford, there was no probable cause to arrest

Alford for those offenses. Id. The Supreme Court rejected that test, explaining

that the relevant inquiry was whether the facts, when viewed objectively, support a

finding of probable cause, not the officer's subjective reason for making the arrest,

and found the "rule that the offense establishing probable cause must be 'closely

related' to, and based on the same conduct as, the offence identified by the

arresting officer of the arrest" inconsistent with its precedent. Id. at 593–94. The

Court remanded the case for consideration of whether the law enforcement officers

lacked probable cause to arrest Alford for obstructing a law enforcement officer or

for impersonating a law enforcement officer. Id. at 595.

In this case, Defendant Police officers assert that although they did not

arrest Green for trespass, there was probable cause to arrest Green for trespass

under § 569.140 of the Missouri Revised Statutes for his refusal to leave the

auditorium at Carr Lane School. Section 569.140.1 provides: "A person commits

the crime of trespass in the first degree if he . . . knowingly remains unlawfully in

a building or inhabitable structure . . . ." An individual's refusal to leave a

building after an authorized agent requests him to leave is sufficient to support the charge of trespassing. State v. Armstrong, 863 S.W.2d 374, 377 (Mo. Ct. App. 1993). In Armstrong, security guards asked protesters to leave an abortion clinic. Id. at 376. After the protesters refused to leave, the guards summoned the police, who also asked the protesters to leave. Id. When the protesters refused, the police arrested them and removed them from the building. Id. The Missouri Court of Appeals concluded that, had the protesters been charged with remaining unlawfully in the building (as opposed to unlawfully entering the building), those facts would support the charge of trespass. Id. at 377.

As in Armstrong, here, a security officer approached Green and asked him to leave. While there is a dispute whether both Kestner Miller and McCrary or just Kestner Miller approached Green, it is undisputed that a security officer asked Green to leave and Green refused and thereby unlawfully remained in the building. It is also undisputed that Defendant Police Officers were aware of Green's refusal to leave. They therefore had probable cause to arrest Green for trespass. Under current Supreme Court precedent, the facts that the police did not arrest Green for trespass and the prosecutors did not charge Green with trespass are not relevant to the Court's probable cause analysis. See generally Devenpeck, 543 U.S. 146.

Accordingly, I find that Regan, Doetzel, Podolak, Griffin, Peek, and Knox did not violate Green's Fourth Amendment rights to be free from unreasonable seizures.

> b. *Excessive force*

Defendant Police Officers argue that Green's Fourth Amendment Excessive Force claim fails as a matter of law because the officers used reasonable force, and even if they used excessive force, they are entitled to qualified immunity because right to be free from the *de minimis* force applied to Green was not clearly established.

"All claims that law enforcement officers have used excessive force, whether deadly or not, in the course of an arrest, investigatory stop, or other seizure are analyzed under the Fourth Amendment's objective reasonableness standard." Nance v. Sammis, 586 F.3d 604, 609–10 (8th Cir. 2009). "Not every push or shove violates the Fourth Amendment, but force is excessive when the officers' actions are not objectively reasonable in light of the facts and circumstances confronting them." Rohrbough v. Hall, 586 F.3d 582, 585 (8th Cir. 2009). The inquiry, then, is "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Nance, 586 F.3d at 610. "Objective reasonableness depends on the facts and circumstances of the case,

including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Rohrbough, 586 F.3d at 586. "A court may also evaluate the extent of the suspect's injuries." Id. "Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts. Wilkins v. Gaddy, 130 S. Ct. 1175, 1178 (2010).

The Eighth Circuit has stated that "a de minimis use of force or injury is insufficient to support a finding of a constitutional violation." Crumley v. City of St. Paul, 324 F.3d 1003, 1007 (8th Cir. 2003). The Supreme Court's decision this year in Wilkins clarified that, at least in the context of Eighth Amendment excessive force claims, the "core judicial inquiry" has shifted "from the extent of the injury to the nature of the force." Wilkins, 130 S. Ct. at 1179. The Court reasoned that a person who was gratuitously beaten should not "lose his ability to pursue an excessive force claim merely because he as the good fortune to escape without serious injury." Id. at 1178–79. The Court reiterated that the extent of the injury suffered is still a factor that "may suggest whether the use of force could plausibly have been thought necessary in a particular situation." Id. at 1178. This interpretation of Eighth Amendment excessive force claims is consistent with interpreting Crumley to mean that the proper inquiry is not whether Green's

injuries were serious or minor, but whether the amount of force used was reasonable. A *de minimis use of force* is insufficient to support a finding of a constitutional violation. <u>Hunter v. Namanny</u>, 219 F.3d 825, 831 (8th Cir. 2000). The same is not necessarily true for *de minimis injuries*. That does not mean the extent of a person's injuries is irrelevant, however. The lack, or minor degree of an injury, remains relevant to determining the reasonableness of the force used. <u>Greiner v. City of Champlain</u>, 27 F.3d 1346, 1355 (8th Cir. 1994). This is true because the less serious the injury, the more likely the amount of force used was reasonable.

In this case, Green claims the officers used excessive force when they handcuffed him and dragged him from the school auditorium. He claims that after he was removed from the auditorium, an officer tightened the handcuffs around his wrists before placing him in the police van to transport him to the Justice Center. Green also claims that Peek used excessive force while driving Green to the Justice Center by excessively stopping the vehicle abruptly, which hurt Green's wrists. Green testified that his circulation was cut-off and did not return for several months, but he never sought medical attention.

Green's excessive force claims can be broken into two categories: (1) the force used to remove him from his seat, handcuff him, and remove him from the

auditorium; and (2) the force used to tighten the handcuffs after Green was
removed from the auditorium and to convey him to the Justice Center.

###### i.    *Force used in auditorium*

The force used to remove Green from the auditorium was reasonable.  In
Curd v. City Court of Judsonia, Arkansas, 141 F.3d 839, 841 (8th Cir. 1998), the
Eighth Circuit found that even if seizing an arrestee's arm was unnecessary to
effect an arrest, that limited amount of force was not objectively unreasonable.
The parties agree that after a police officer told Green he was under arrest, he
grabbed Green's arm.  Although Clemens testified that an officer "violently
grabbed" Green by the arm and yanked him on to the floor, and another officer
then helped to "violently" roll Green onto the floor, and Purdy testified Green was
"violently" yanked by his arm and out of his seat and thrown on the floor, Green
submitted a video that shows the same incident Clemens and Purdy describe.  No
party disputes that the video depicts what actually occurred.  In the video,
absolutely no violence was used against Green.  The video shows an officer and
Green conversing and Green calmly waving his hand back and forth as if to say,
"no."  The officer then grabbed Green's left arm and began to pull Green from the
chair.  Another officer placed his hand on Green's back to assist in pulling Green
from the chair.  Green did not assist the officers in lifting himself from his seat,

which forced the officers to use their own strength to pull him from his seat. Notwithstanding Clemens' and Purdy's characterizations of the incident as violent, no reasonable person could conclude that the amount of force the officers used in seizing Green's arm and lowering him to the floor was excessive.

After Green was placed on his stomach on the floor, the officers pulled and dragged Green for approximately 30 to 50 feet out of the auditorium. Green testified it was painful, but not so painful that he screamed out. This lasted about half a minute. Green does not claim that the officers threw him or jostled him about as they dragged or carried him out of the auditorium. It is undisputed that Green refused to walk out and instead went limp so that the officers would be forced to use their own strength to remove Green. This *de minimis* use of force cannot support a finding that the officers used unreasonable force in removing Green from the auditorium. See Namanny, 219 F.3d at 831.

> ii. *Force used after Green was removed from the auditorium*

Green also complains that an officer used excessive force by tightening the handcuffs around his wrists and that Peek used excessive force by driving in an abusive manner. As for Green's claim that officers used excessive force by applying the handcuffs too tightly, the Eighth Circuit concluded in Foster v.

Metropolitan Airports Comm'n, 914 F.2d 1076, 1082 (8th Cir. 2003) that minor injuries from the use of handcuffs, without some evidence of a more permanent injury, cannot support a claim of excessive force based on handcuffs being applied too tightly.  Green testified that although his circulation was cut off by the handcuffs and did not return for a couple of months, he never sought medical treatment for his wrist injuries, and he currently has no problems with his hands or wrists that are attributable to Defendant Police Officers' conduct.

Green also claims that Peek engaged in abusive driving because the cruiser came to about 6 or 7 abrupt stops during the five to ten minute ride to the Justice Center, which jostled Green and caused handcuffs to tighten.  Green does not allege that Peek touched him in any way, and he acknowledges that the stops did not cause him to fall or hit the inside of the cruiser.  There is simply no evidence that the manner in which Peek was driving was an excessive use of "force."  Green also admitted that he could not see the road, and it was impossible for him to know why Peek stopped so abruptly.  Moreover, the only physical injuries Green claims to have suffered are the injuries to his wrists that were caused by the handcuffs.  Green has failed to demonstrate that any police officers used excessive force in effecting his arrest.  As a result, Defendant Police Officers are entitled to summary judgment on Green's Fourth Amendment Excessive Force claims.

### 2. Fourteenth Amendment claims

#### a. Due Process Clause

Green's complaint is not a model of clarity. Green seems to bring some claims under the Fourteenth Amendment Due Process Clause. In their motion for summary judgment, Defendant Police Officers interpreted Green's Fourteenth Amendment Due Process Clause claims as relating exclusively to the alleged use of excessive force during Green's arrest. In his response in opposition, Green did not dispute this interpretation of his complaint. Therefore, I, too, will limit Green's due process claim to his allegations of excessive force. As noted above, the Supreme Court has made explicit "that all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham, 490 U.S. 386 at 395. While the due process clause protects a pretrial detainee from the use of excessive force amounting to punishment, Green does not allege any excessive force outside of his arrest. Id. at 395 n.10. As a result, Green's Fourteenth Amendment Due Process Clause claim fails as a matter of law.

## b. Privileges and Immunities

Defendant Police Officers also move for summary judgment on Green's claims under the Fourteenth Amendment Privileges and Immunities Clause. Defendant Police Officers argue that Green's Privileges and Immunities claim fails because his lawsuit does not relate to discrimination against out-of-state residents in matters of fundamental concern or to any interstate matters. They cite the law for evaluating claims under the Privileges and Immunities Clause of Article IV, and do not cite any law concerning the Fourteenth Amendment Privileges and Immunities Clause. E.g. United Bldg. and Constr. Trades Council of Camden County and Vicinity v. Mayor and Council of the City of Camden, 465 U.S. 208 (1984). Unlike the Article IV "comity clause," which prohibits unreasonable distinctions in law between citizens of a state and citizens of other states, the Privileges and Immunities Clause of the Fourteenth Amendment protects only the rights of United States citizenship.

In his response in opposition, Green does not respond to Defendant Police Officers' assertion that they are entitled to judgment on his claim under the Privileges and Immunities clause. Although a party opposing summary judgement "may not rely merely on allegations or denials in its own pleading," that obligation attaches only "[w]hen a motion for summary judgment is properly made as

supported." Fed. R. Civ. P. 56(e)(2). To make and properly support a motion for summary judgment, the movant must show there is no genuine issue of material fact and "that the movant is entitled to judgment as a matter or law." Fed. R. Civ. P. 56(c)(2). In this case, Defendant Police Officers have not even identified the law applicable to Green's Fourteenth Amendment Privileges and Immunities claim. While it is true that Green's Complaint lacks clarity and it is not clear what specific privilege and immunity Green claims Defendants deprived him of, Defendant Police Officers have not addressed any of the rights protected by the Fourteenth Amendment Privileges and Immunities Clause (i.e. the right to petition Congress, the right to vote in federal elections, the right to travel, etc.). The Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 79–81 (1873); Saenz v. Roe, 526 U.S. 489, 502 (1999)). For this reason, they are not entitled to summary judgment. However, because Green's complaint fails to state a claim for any of the rights protected by the Fourteenth Amendment Privileges and Immunities Clause, I will dismiss any claim he purports to bring under the Fourteenth Amendment Privileges and Immunities Clause.

      *c.     Equal Protection claims*

Green claims Defendant Police Officers discriminated against him because of his race. Defendant Police Officers argue they are entitled to judgment as a

matter of law on Green's Fourteenth Amendment Equal Protection claim because Green has failed to prove unlawful, purposeful discrimination. Green's response in opposition does not address any of Defendant Police Officers' arguments regarding Green's Equal Protection claims.

As a general matter, "the Equal Protection Clause requires that state actors treat similarly situated people alike." Habhab v. Hon, 536 F.3d 963, 967 (8th Cir. 2008). "State actors may, however, treat dissimilarly situated people dissimilarly without running afoul of the protections afforded by the clause." Id. To prevail on his claim, Green, as a threshold matter, must show that the Defendant Police Officers treated him differently than similarly-situated audience members based on his race.

Green has failed to show that Defendant Police Officers treated him differently than non-African-American audience members or that their decision to arrest him was based on his race. First, the record does not show that McCrary, or any other person, identified any other members of the audience as making loud noise or yelling. While there is no evidence that Defendant Police Officers failed to arrest members of other races after being informed about noise-making or yelling, there is also no evidence to that they had been informed that any other person was making noise or yelling. Additionally, there is no evidence that

Defendant Police Officers' decision to arrest Green was based on his race. Although Green testified that he believed police officers in the City of St. Louis have a general attitude of dominance and often abuse their authority, Green has submitted no evidence that Defendant Police Officers held any racial animus towards African-Americans, that they said any remarks where one could infer racial animus, or that they treated Green differently than similarly situated people of another race. The only evidence submitted about Defendant Police Officers' motivation to arrest Green was their testimony that their actions to arrest Green were based exclusively on the information provided to them by McCrary. Because there is no evidence that Defendant Police Officers' actions were based on Green's race, I will grant summary judgment to Defendant Police Officers on Green's Equal Protection claim.

### 3. 42 U.S.C. § 1981 claim

Like Green's Fourteenth Amendment Equal Protection claim, Green claims he was denied equal rights under the law on account of his race in violation of 42 U.S.C. § 1981. Defendant Police Officers argue they are entitled to judgment as a matter of law on Green's § 1981 claim because Green has failed to prove that Defendant Police Officers acted with the intent to discriminate against him on the

basis of race. Green's response in opposition does not address any of Defendant Police Officers' arguments regarding his § 1981 claim.

Section 1981, like the Equal Protection clause, can be violated only by purposeful discrimination. Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 389, 391 (1982). Liability under § 1981 can only be imposed if the plaintiff can prove the defendant engaged in intentional discrimination on the basis of race. Id. at 391. As discussed above, Green has failed to produce any evidence that Defendant Police Officers' decision to arrest him was based on his race. As a result, Green's § 1981 claim fails as a matter of law, and I will grant summary judgment to Defendant Police Officers on this claim.

### 4.     *First Amendment Claim*

Green claims his arrest was motivated, in part, as retaliation against him for his long history of civil rights activities, and to prevent him from exercising his constitutional rights in the future. Defendant Police Officers argue that they are entitled to judgment because Green has presented no evidence the officers acted with the intent to deprive him of his First Amendment rights and there is no evidence any of Defendant Police Officers were aware of Green's civil rights history. Green responds that his reputation as a public figure is so well-known that it is "doubtful" that Defendant Police Officers were unaware of his civil rights

activities.  Green also argues that the fact that other members of the audience were disruptive, but were not arrested gives rise to an inference that Green was "specially singled out for arrest for reasons other than misconduct, peace disturbance or wrongdoing of any type."

The First Amendment to the United States Constitution provides that "Congress shall make no law ... abridging the freedom of speech. . . or the right of the people to peaceably assemble . . . ."  "A citizen's right to exercise First Amendment freedoms without facing retaliation from government officials is clearly established."  Baribeau, 596 F.3d at 481.  To prevail on his First Amendment retaliation claim, Green must show a causal connection between Defendant Police Officers' retaliatory animus and Green's subsequent injury.  Id. "Retaliation need not have been the sole motive, but it must have been a 'substantial factor' in the decision to arrest."  Id.  Green "must show that the retaliatory motive was a 'but-for' cause of the arrest—i.e., that [he was] 'singled out' because of [his] exercise of constitutional rights."  Id.  Finally, Green must demonstrate that Defendant Police Officers' "adverse action caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing in the protected activity."  Id.

Again in affidavits containing identical language, Regan, Doetzel, Podolak, Griffin, and Knox testified that "[b]efore approaching [Green] that evening, [they] had no specific knowledge of [Green's] prior civil rights activities."  Regan, Doetzel, Podolak, Griffin, and Knox further testified that their "actions that night in helping to arrest Green were not motivated in any part by [Green's race or] civil rights activities at any point in time, or any other factor other than the information provided to [them] by Mr. McCrary."  Peek testified he "had no knowledge of [Green's] prior civil rights activities," and his act of "conveying [Green] to the Criminal Justice Center was not motivated in any manner by [Green's race], any civil rights activity by [Green] or any other factor other than [his] assignment to convey any arrested individuals in the cruiser."  Green has presented no evidence that but-for his past exercise of his First Amendment rights, Defendant Police Officers would not have arrested him.  The evidence shows that Defendant Police Officers arrested Green because McCrary told them Green was disrupting the school board meeting by making loud oral outbursts.  Because there is no evidence Defendant Police Officers singled out Green due to his exercise of his constitutional rights, I will grant summary judgment to Defendant Police Officers on Green's First Amendment claims.

### 5.    42 U.S.C. § 1985 Conspiracy claim

Green contends that Defendant Police Officers conspired to violate his constitutional rights.  Defendant Police Officers argue that they are entitled to judgment because there is no evidence that they formed an agreement to violate Green's constitutional rights.  Green argues that there was a "seamless conspiracy" to arrest him, as evidenced by board member Clinkscale's signal to McCrary, who signaled to Kestner Miller, who signaled back to McCrary, who signaled to the police officers to arrest Green.

To establish a 42 U.S.C. § 1985(3) conspiracy claim, a plaintiff must show "(1) the existence of a civil conspiracy; (2) that the purpose of the conspiracy was to deprive her either directly or indirectly of her civil rights; (3) that a conspirator did an act in furtherance of the object of the conspiracy; and (4) damages, shown by demonstrating either injury to the person or property or the deprivation of a civil right."  Mettler v. Whitelegde, 165 F.3d 1197, 1206 (8th Cir. 1999).  To avoid summary judgment, the plaintiff must allege with particularity and demonstrate with specific material facts that the defendants reached an agreement. City of Omaha Employees Betterment Ass'n v. City of Omaha, 883 F.2d 650, 652 (8th Cir. 1989); Reasonover v. St. Louis County, Missouri, 447 F.3d 569, 582 (8th Cir. 2006).  While those allegations may include circumstantial evidence, Green

must point "to at least some facts that would suggest that [defendants] reached an understanding to violate [his] rights." City of Omaha Employees Betterment Ass'n, 883 F.2d at 652; Reasonover, 447 F.3d at 582.

Although Green has submitted evidence that a series of nods and hand signals that communicated "come forward" or "come here" were made by Clinkscale, Kestner Miller and McCrary, Green has not provided any evidence that there was a "meeting of the minds" between Defendant Police Officers and others to violate Green's rights. Defendant Police Officers testified that they did not come to an agreement with any person regarding Green. The evidence shows that Defendant Police Officers were summoned by McCrary who either asked them to arrest Green or to eject him from the meeting because Green was making loud outbursts. There is simply no evidence that Defendant Police Officers conspired to deprive Green of his constitutional rights. Moreover, in order to prevail on a claim for civil conspiracy under 42 U.S.C. § 1985, the plaintiff must prove a deprivation of a constitutional right or privilege. White v. McKinley, 519 F.3d 806, 814 (8th Cir. 2008). As discussed above, Green has not established that Defendant Police Officers deprived him of a constitutional right or privilege. As a result, Defendant Police Officers are entitled to judgment on Green's conspiracy claim.

## 6. *Negligence by Defendant Police Officers*

Defendant Police Officers argue that there is no cause of action for negligent use of force or negligent abusive treatment under Missouri law and Green has not identified any Missouri case involving negligent abusive treatment or use of force. If there is a cause of action for negligent use of force or abusive treatment, Defendant Police Officers are entitled to immunity under the doctrine of official immunity. "Official immunity provides protection to public officials from liability for negligence related to the performance of their discretionary acts." Conway v. St. Louis County, 254 S.W.3d 159, 164 (Mo. Ct. App. 2008). It does not shield officers from liability for their ministerial acts. The purpose is "to protect individual public officers who, despite imperfect information and limited resources must exercise discretion in performance of their duties." Id. A discretionary act is one where a public official must exercise reason and discretion in determining how an act should be done or what course to pursue. Id. A ministerial act is an act that is clerical in nature and must be performed without regard to the officer's judgment or opinion concerning the propriety of the act to be performed. Id.

Official immunity does not apply to discretionary acts done in bad faith or with malice. Blue v. Harrah's North Kansas City, LLC, 170 S.W.3d 466, 479

(Mo. Ct. App. 2005).  Both bad faith and malice generally require an actual intent

to cause injury.  Id.

> A defendant acts with malice when he wantonly does that
> which a man of reasonable intelligence would know to be
> contrary to his duty and which he intends to be prejudicial
> or injurious to another.  An act is wanton when it is done
> of wicked purpose, or when done needlessly, manifesting
> a reckless indifference to the rights of others....
>
> Bad faith, although not susceptible of concrete definition,
> embraces more than bad judgment or negligence.  It
> imports a dishonest purpose, moral obliquity, conscious
> wrongdoing, breach of a known duty through some ulterior
> motive or ill will partaking of the nature of fraud.  It also
> embraces actual intent to mislead or deceive another.

Id.  Because Green has produced no evidence that Defendant Police Officers'

actions in using force on him were done in bad faith or with malice, Defendant

Police Officers are entitled to official immunity on Green's negligence claim.  As

a result, I will grant judgment on this claim.

### 7.  *Malicious Abuse of Process*

The elements of an abuse of process claim are: (1) the defendant made an

illegal, improper, perverted use of process, a use neither warranted nor authorized

by the process; (2) the defendant had an improper purpose in exercising such

illegal, perverted, or improper use of process, and (3) damages resulted.  Duvall v.

Lawrence, 86 S.W.3d 74, 84–85 (Mo. Ct. App. 2002).  "The essence of abuse of

process is not the commencement of an action without justification, but it is the misuse of process for an end other than that which it was designed to accomplish." Guirl v. Guirl, 708 S.W.2d 239, 245 (Mo. Ct. App. 1986). There is no evidence that Defendant Police Officers had an improper purpose or that their participation in the prosecution of Green was used to compel Green to do some collateral thing that he could not be legally be compelled to do. Duvall, 86 S.W.3d at 85. As a result, I will grant judgment to Defendant Police Officers on this claim.

### 8. *False Imprisonment*

Under Missouri law, an action for false imprisonment must be brought within two years after the cause of action has accrued. Mo. Rev. Stat. § 516.140. A cause of action for false imprisonment accrues at the time the plaintiff is released from imprisonment. Stafford v. Muster, 582 S.W.2d 670, 680 (Mo. 1979). Green testified he was arrested around 9:00 p.m. on November 18, 2003 and was bonded out around midnight. Therefore, Green's cause of action accrued on November 19, 2003, at the latest, and the statute of limitations for false imprisonment ran on November 19, 2005. Green filed this lawsuit on November 17, 2006. Green's false imprisonment claim is time-barred, and Defendants are entitled to judgment on this claim.

### 9. *False Arrest*

The Missouri Supreme Court has explained that false arrest is simply another name for the tort of false imprisonment.  Highfill v. Hale, 186 S.W.3d 277, 280 (Mo. 2006) ("False imprisonment, also called false arrest, is the confinement, without legal justification, by the wrongdoer of the person wronged.").  As discussed above, any cause of action Green may have had for false arrest is barred by the statute of limitations.  Accordingly, Defendants are entitled to judgment on Green's false arrest claim.

### B. Claims Green brings against the Members of the Board of Police Commissioners, Chief Mowka, and Secretary Nocchiero

#### 1. Constitutional claims under Monell

The only claims Green appears to bring against the Police Board under Monell are for the Police Department's policy and practice of authorizing excessive force and verbal abuse, and for failure to train or supervise officers to prevent the use of excessive force and verbal abuse.[9]  A municipality cannot be held liable under § 1983 solely because it employs a tortfeasor.  Monell v. Dep't of Social Servs., 436 U.S. 658, 691 (1978).  "[I]n other words, a municipality cannot

---

[9]  As described in the background section, Count III asserts the Police Board had a policy and practice to allow and a policy and practice to authorize, acquiesce to, and cover up the use of excessive force.  Green further assets the Police Department had a policy and practice of authorizing its officers to verbally abuse detainees, and that these policies and practices caused Green to experience a constitutional deprivation.  Green also claims the Police Department failed to adequately train, direct, supervise or control Defendant Police Officers concerning the use of excessive force and verbal abuse.

be held liable under § 1983 on a *respondeat superior* theory." Id. A local government can, however, be liable when its policy or custom is responsible for the constitutional violation. Id. at 694. In order for municipal liability to attach, the employee must have committed a constitutional violation. McCoy v. City of Monticello, 411 F.3d 920, 922 and n.3 (8th Cir. 2005). Because, as discussed above, none of Defendant Police Officers used excessive force and there is no evidence Green experienced verbal abuse, the Police cannot be held liable under Monell.

### 2. *Respondeat superior* for intentional torts

In Counts IX and X, Green seeks damages from the St. Louis City Police Department for the intentional torts Defendant Police Officers committed within the scope of their employment. The Police Board argues that sovereign immunity bars Green's claims against it because it is a state created entity. Although the Supreme Court of Missouri held that the Board is an "agency of the state" in Smith v. State, 152 S.W.3d 275, 278 (Mo. 2005), the Eighth Circuit has rejected that as a basis for Eleventh Amendment sovereign immunity. Thomas v. St. Louis Bd. Of Police Comm'rs, (8th Cir. 2006). As a result, the Police Board cannot avail itself to the protections of Eleventh Amendment sovereign immunity.

"Under *respondeat superior*, an employer is liable for damages from the misconduct of its employee acting within the course and scope of employment." Stanley v. City of Independence, 995 S.W.2d 485, 487 (Mo. 1999). "[T]he police board, as an employer, cannot be held liable under the doctrine of *respondeat superior* unless the employee is found liable." Bittner v. City of St. Louis Police Bd. Of Comm'rs, 925 S.W.2d 495, 498 (Mo. Ct. App. 1996). In this case, none of the Defendant Police Officers were liable for intentional torts (i.e. false imprisonment, false arrest, abuse of process) against Green. Therefore, Green's claims under *respondeat superior* against the Police Board fail as a matter of law.

       3.      *Negligent training, supervision, and control of police officers*

In Count XIV, Green seeks damages from the St. Louis City Police Department for negligently failing to train, supervise, and control its police officers in "the use of deadly force and other matters incidental to the exercise of police functions." Although Green's complaint is frequently difficult to interpret, it is clear that Green's claims concerning constitutional violations are brought in Counts I and III. I therefore interpret Count XIV to address the negligent training, supervision, and control that gave rise to Green's state law claims.

The sole argument that the Police Board makes for judgment on this claim is that Green's claims are barred by sovereign immunity. As discussed above, both

the Supreme Court and the Eighth Circuit have held that the St. Louis Board of Police Commissioners is not protected by Eleventh Amendment sovereign immunity. Although the Board cannot avail itself to the protections of the Eleventh Amendment, because this is a state-law claim, I must also analyze the possibility of state-law immunity.

The substantive law of Missouri controls Green's state law claims. St. Paul Fire & Marine Ins. Co. v. Missouri United Sch. Ins. Council, 98 F.3d 343, 345 (8th Cir. 1996). I must therefore determine how the Missouri Supreme Court would decide the issue. To do so, I must first consider any pertinent decisions of the Missouri Supreme Court. Troknya v. Cleveland Chiropractic Clinic, 280 F.3d 1200, 1207 (8th Cir. 2002). If none are available, I must look to lower court decisions and other reliable state law authorities. Id.

The Missouri Supreme Court has repeatedly stated that the St. Louis Police Board is a state agency. Hodges v. City of St. Louis, 217 S.W.3d 278, 281 (Mo. 2007); Smith v. State, 152 S.W.3d 275, 278 (Mo. 2005); State ex rel. Sayad v. Zych, 642 S.W.2d 907, 910 (Mo. 1982). Opinions from the Missouri Courts of Appeals indicate that the Police Boards of St. Louis and Kansas City are entitled to statutory sovereign immunity under Mo. Rev. Stat. § 537.600 unless the claims involve motor vehicle accidents or injuries caused by dangerous property

conditions. <u>Bittner v. City of St. Louis Bd. Of Commr's</u>, 925 S.W.2d 495, 499

(Mo. Ct. App. 1996); <u>Fantasma v. Kansas City, Mo. Bd. Of Police Commr's</u>, 913

S.W.2d 388, 391 (Mo. Ct. App. 1996). Because Green's claims do not implicate

either exception to § 537.600, the Police Board is entitled to statutory sovereign

immunity on Green's claims of negligent training, supervision, and control of the

police officers. As a result, I will grant summary judgment to the Police Board on

this claim.

### C.    *Claims against School Security Officers*

#### 1.    *First Amendment*

McCrary and Kestner Miller argue that because the School Board meeting

was a designated (or limited) public forum and Green made loud outbursts and

used inappropriate language, they were permitted to eject Green from the meeting.

They also assert that because Green claims he was sitting quietly and not saying

anything at the time of his arrest, as a matter of law, they could not have violated

his First Amendment rights. I do not address whether McCrary and Kestner Miller

are entitled to qualified immunity because they did not assert qualified immunity

as a defense in their motion for summary judgment.

One of McCrary and Kestner Miller's arguments relies on a disputed

material fact, whether Green was silent at the meeting or made loud outbursts,

which in itself would defeat their motion for summary judgment. Both of their

arguments indicate a fundamental misapprehension about the nature of Green's

First Amendment claims. The focal point of McCrary and Kestner Miller's First

Amendment argument is what types of restrictions the School Board could place

on Green's speech. They spend substantial energy discussing the type of forum

the School Board meeting was, the types of permissible restrictions on speech in

that forum, and how those restrictions applied to Green's claim to show that they

did not impermissibly restrain Green's speech at the School Board meeting.

But Green's First Amendment claim is not that his speech was restricted at

the School Board meeting. Instead, Green's claim is that Defendant Police

Officers and School Security Officers *retaliated against him* for his past civil

rights activities and his speech during the comment section of the meeting.

Indeed, this is one of the few areas where his claims are relatively clear.[10]  On page

4 of Green's complaint, he asserts:

> 11c Plaintiff Green *because of his race (Black) and
> his history of lawful civil rights activities for many decades*

---

[10] Defendant Police Officers recognized Green's claim as one for retaliation and argued
that the claim fails because their conduct was not motivated by Green' civil rights activities.
Green's response in opposition makes it clear that his First Amendment claims are for retaliation.
For example, he argues, "Green was singled out for retribution," and "And for what could Mr.
Green be singled out other than for his past exercise of his First Amendment Rights, over the last
fifty years and also for his exercise of free speech in critical and public opposition to the Slay
majority slate . . . ."

and his lawful and appropriate exercise of First Amendment Rights of free speech and assembly, Plaintiff was arrested at a St. Louis School Board meeting on November 18, 2003 hereafter herein [sic], the only person arrested at that meeting, by the collaborative conspiratorial action or acquiescence of the then School Board of the City of St. Louis, Board Members. *This action against Plaintiff was because of his exercise of and to prevent further exercise* of his U.S. Constitution [sic] protected rights under the First, Fourth, Fifth, Eighth, Thirteen [sic] and Fourteenth Amendments and violation of 42 U.S.C. 1981, 1982, 1983 and common law and to deny him equal protection of the law and privileges and immunities.

11d   Plaintiff's arrest, prosecution [sic] (which resulted in acquittal) arose out of unlawful [sic] November 18, 2003 arrest at the school board meeting in which Plaintiff was exercising his Rights of free speech and assembly and was in [sic] result of the acted on conspiracy and common plan to deny Plaintiff his Constitutional rights and equal protection of the law and rights of free speech and assembly and because of his race (Black) by the Defendant Police Officers and Defendant School Security Officers *who acted against Plaintiff because of his race and exercise of his Constitutional rights of free speech and assembly* . . . .

As discussed above, citizens have the right to exercise their First Amendment freedoms without facing retaliation from government officials. Baribeau, 596 F.3d at 481. Although a party opposing summary judgement "may not rely merely on allegations or denials in its own pleading," that obligation attaches only "[w]hen a motion for summary judgment is properly made as

supported." Fed. R. Civ. P. 56(e)(2). To obtain summary judgment, the movant must show there is no genuine issue of material fact and "that the movant is entitled to judgment as a matter or law." Fed. R. Civ. P. 56(c)(2). McCrary and Kestner Miller have not shown and did not argue in their motion for summary judgment that they are entitled to judgment on Green's First Amendment retaliation claim. In their reply, McCrary and Miller claim that Green has failed to provide facts supporting his theory that he was arrested as retribution for his prior civil rights activity and that Green has the burden to establish every element. As a general rule, courts will not consider arguments raised for the first time in a reply. Barham v. Reliance Standard Life Ins. Co., 441 F.3d 581, 584 (8th Cir. 2006). As a result, I will deny McCrary and Kestner Miller judgment on this claim.

### 2. *Fourth Amendment claims*

McCrary and Kestner Miller argue that they cannot be liable for violating Green's Fourth Amendment rights because Green admits that they did not personally participate in his arrest. "The Fourth Amendment covers only 'searches and seizures.'" County of Sacramento v. Lewis, 523 U.S. 833, 843 (1998). A person is seized under the Fourth Amendment if a state agent, " by means of physical force or show of authority terminates or restrains his freedom of movement." Brendlin v. California, 551 U.S. 249, 254 (2007). In this case, it is

undisputed that neither McCrary nor Kestner Miller physically detained or confined Green.  McCrary and Kestner Miller are therefore entitled to summary judgment on Green's Fourth Amendment claims.

### 3.    *Fourteenth Amendment* claims

McCrary and Kestner Miller argue they are entitled to judgment on Green's Fourteenth Amendment Equal Protection Clause claim because there is no evidence his removal from the School Board meeting was based on his race.  As discussed above, to prevail on his claim, Green, as a threshold matter, show that McCrary and Kestner Miller treated him differently than similarly-situated audience members based on his race.  There is simply no evidence that the decision to remove Green from the School Board meeting was based on race.  As a result, McCrary and Kestner Miller are entitled to judgment on Green's Equal Protection Clause claim.  I will also grant them summary judgment on Green's Due Process Clause argument for the same reasons I granted Defendant Police Officers judgment on Green's Fourteenth Amendment Due Process clause claims, namely that Green's excessive force claim must be brought under the Fourth Amendment, and not the Fourteenth Amendment.  Additionally, I will dismiss without prejudice any claims Green brings against McCrary and Kestner Miller

under the Privileges and Immunities Clause for failure to state a claim for the reasons discussed above.

4. *42 U.S.C. § 1981 claim*

In their motion for summary judgment, McCrary and Kestner Miller recognize that Green alleges they violated his statutory civil rights under 42 U.S.C. § 1981 in Count II. Although McCrary and Kestner Miller argued that Green's §§ 1983 and 1985 claims fail, they did not set forth any argument why they are entitled to judgment on Green's § 1981 claim. As a result, I will not grant judgment to McCrary and Kestner Miller on Green's § 1981 claim.

5. *42 U.S.C. § 1985 conspiracy claim*

Green contends that McCrary and Kestner Miller, along with Defendant Police Officers and the Police Board, conspired to violate his constitutional rights. McCrary and Kestner Miller argue that they are entitled to judgment on Green's conspiracy claims because Green has failed to establish that they violated any of his constitutional rights, that they did not ask Defendant Police Officers to arrest Green, and that there is no evidence that they formed an agreement to violate Green's constitutional rights. Green argues that there was a "seamless conspiracy" to arrest him, as evidenced by Board Member Clinkscales' signal to McCrary, who

signaled to Kestner Miller, who signaled back to McCrary, who signaled to the police officers to arrest Green.

As discussed above, to establish a 42 U.S.C. § 1985(3) conspiracy claim, a plaintiff must show "(1) the existence of a civil conspiracy; (2) that the purpose of the conspiracy was to deprive her either directly or indirectly of her civil rights; (3) that a conspirator did an act in furtherance of the object of the conspiracy; and (4) damages, shown by demonstrating either injury to the person or property or the deprivation of a civil right." Mettler, 165 F.3d at 1206. Green must allege with particularity and demonstrate with specific material facts that the defendants reached an agreement. City of Omaha Employees Betterment Ass'n, 883 F.2d at 652; Reasonover, 447 F.3d at 582. While those allegations may include circumstantial evidence, Green must point "to at least some facts that would suggest that [defendants] reached an understanding to violate [his] rights." City of Omaha Employees Betterment Ass'n, 883 F.2d at 652; Reasonover, 447 F.3d at 582.

McCrary and Kestner Miller first argue that because Green has failed to show that they violated any of his constitutional rights, his claim for conspiracy fails. In order to prevail on a claim for civil conspiracy under 42 U.S.C. § 1985, the plaintiff must prove a deprivation of a constitutional right or privilege. White,

519 F.3d at 814.  McCrary and Kestner Miller rely on their earlier arguments to show that Green cannot prove they violated any of his constitutional rights.  As discussed above, McCrary and Kestner Miller have failed to show that they did not violate Green's First Amendment rights.

McCrary and Kestner Miller also argue that they are entitled to judgment as a matter of law because it is "undisputed" that they did not ask any St. Louis City police officers to arrest Green at the School Board meeting.  Both McCrary and Kestner Miller testified that they did not ask any police officers to arrest Green.  While Defendant Police Officers testified in their affidavits that McCrary asked for their assistance in requesting Green to leave the auditorium, some of Defendant Police Officers provided a slightly different account in their answers to Green's second interrogatories.  In response to the question whether they heard any statements from School Board Member or School Board Security Officers on November 18, 2003, Doetzel stated, "Defendant has no specific recollection of any statement of comment of any School Board Member on the referenced date.  Further answering, please see CN # 03-138991."  Knox and Regan stated, "With regard to statements or comments by Board Security Officers, please see CN# 03-138991."  That document, the police report, states "Charles McCrary summoned Lt. John Podolak and Sgt. David Doetzel to his location and informed us that

Percy G. Refused to leave on his own *and requested that Percy G. Be arrested for Peace Disturbance*."  Accordingly, it is not "undisputed" that McCrary did not ask the police officers to arrest Green.  McCrary and Kestner Miller also argue that Green's conspiracy claim fails because Defendant Police Officers had probable cause to arrest Green.  Green alleges McCrary and Kestner Miller conspired to deprive him of his constitutional rights, including his First Amendment rights.  If McCrary and Kestner Miller conspired to have Green arrested and ordered Green to leave the auditorium in retaliation for Green's First Amendment activities and Defendant Police Officers had probable cause to arrest Green based on *that order,* the fact that McCrary and Miller succeeded in manufacturing probable cause for Defendant Police Officers to arrest Green cannot undermine Green's claim that McCrary and Kestner Miller conspired to have him arrested.

Additionally, McCrary and Kestner Miller argue that Green "cannot identify a single fact" to support his argument that they conspired to cause his arrest.  "The question of the existence of a conspiracy to deprive [a plaintiff] of [his or her] constitutional rights should not be taken from the jury if there is a possibility the jury could infer from the circumstances a 'meeting of the minds' or understanding among the conspirators to achieve the conspiracy's aims."  <u>White</u>, 519 F.3d at 816.  "Because the elements of a conspiracy are rarely established through means other

than circumstantial evidence, and summary judgment is only warranted when the evidence is so one-sided as to leave no room for any reasonable difference of opinion as to how the case should be decided[,] [t]he court must be convinced that the evidence presented is insufficient to support any reasonable inference of a conspiracy." Id. at 816. Here, although both McCrary and Kestner Miller deny having reached an agreement with "any St. Louis City police officers, or any other named defendants," they do not deny having reached an agreement with any person, including Clinkscale.[11] This "unexplained gap" in the materials submitted by McCrary and Kestner Miller is sufficient to support a reasonable inference of conspiracy when coupled with the series of signals between McCrary, Kestner Miller, and Clinkscale, which may be evidence of a conspiracy. Adickes v. S. H. Kress & Co., 398 U.S. 144, 153–54, 158. A nod of the head or hand gesture could also indicate the parties were simply acting in concert and had not come to an agreement beforehand. But neither McCrary nor Kestner Miler testified that they did not reach an agreement with Clinkscale or any other individual. "Because the elements of conspiracy are rarely established through means other than circumstantial evidence, and here there is sufficient evidence to support a

---

[11] Unlike McCrary and Kestner Miller, Defendant Police Officers testified that they came to no agreement with other officers, any other defendant or *any other person*.

reasonable inference of conspiracy, summary judgment [is] not appropriate."
White, 519 F.3d at 816.

###### 6. *Negligence*

McCrary and Kestner Miller argue that they are entitled to judgment on Green's negligence claims because there is no evidence they used any force against him. "To establish a claim for negligence under Missouri law, the plaintiff must prove: (1) the existence of a duty on the part of the defendant to protect the plaintiff from injury, (2) a failure of the defendant to perform that duty, and (3) an injury proximately caused by the defendant's failure." Blevens v. Holcomb, 469 F.3d 692, 694 (8th Cir. 2006). Assuming *arguendo* that a tort for the negligent use of excessive force exists under Missouri law, Green has failed to show that McCrary and Kestner Miller breached their duty in any way or were the proximate cause of Green's injuries. Green admits that neither McCrary nor Kestner Miller used any force against him. The undisputed evidence shows that the only force used against Green was by Defendant Police Officers. As a result, McCrary and Kestner Miller are entitled to summary judgment on Green's claim of negligence.

###### 7. *Malicious abuse of process*

As discussed above, "[t]he essence of abuse of process is not the commencement of an action without justification, but it is the misuse of process

for an end other than that which it was designed to accomplish." <u>Guirl</u>, 708 S.W.2d at 245. "The test is whether the process has been used to accomplish some unlawful end, or to compel [the] defendant to do some collateral thing which he could not be compelled to do legally." <u>Barnard v. Barnard</u>, 568 S.W.2d 567, 571 (Mo. Ct. App. 1978). Green claims that McCrary and Miller used the criminal process to dissuade him from asserting his rights against them and other defendants. While the initiation of a criminal proceeding to compel a person to refrain from asserting his rights would constitute an abuse of process, <u>cf. Ritterbusch v. Holt</u>, 789 S.W.2d 491, 494 (Mo. 1990) (defendants initiated criminal proceeding to compel plaintiff to pay for damages to an automobile), there is no evidence that McCrary and Kestner Miller participated in the prosecution of Green to compel him to refrain from asserting his rights against them or do any other collateral thing that he could not be legally be compelled to do. <u>Duvall</u>, 86 S.W.3d at 85. As a result, I will grant judgment to McCrary and Kestner Miller on this claim.

8.    *False arrest and false imprisonment*

As discussed above, Green's claims of false imprisonment and false arrest are barred by the statute of limitations. As a result, McCrary and Kestner Miller are entitled to judgment on these claims.

### D. Claims Green brings against SAB

It is difficult to ascertain which, if any, counts Green has brought against SAB. SAB interpreted Green's complaint as if Green brings Counts I and Count IV against it, and moved for summary judgment on both counts. It is clear that in his Second Amended Complaint, Green brought Count IV against the School Board, among others, but Count IV of Green's Fourth Amended Complaint concerns only "Defendant Officers, and School Security Officers, said Chief and Board of Commissioners, acting and operating as St. Louis Missouri Police Department." There does not appear to be any allegation that SAB was involved in the conspiracy alleged in Count IV, and the count does not assert liability under Monell.

As discussed earlier, Green may bring Count I against the SAB for constitutional violations under Monell. Although it is not clear whether Count I is brought against SAB, it is clear that Green has not provided any evidence the School District had a policy or custom that caused a violation of his constitutional rights. As a result, SAB is entitled to summary judgment on all claims brought against it.

### E. Claims Green brings against the Prosecutors, Slay, as Mayor of the City of St. Louis, and the City of St. Louis

In their statement of uncontroverted material facts, City Defendants suggested Count XVII, which is for malicious prosecution in violation of 42 U.S.C. §§ 1981, 1983 and 1985, was the only count asserted against them. Green denied this and stated that other portions of the Complaint direct claims against City Defendants. Because Green did not identify which counts he claims to assert against City Defendants, I ordered him to specify the counts. Green responded that Counts III, IV, and X are purportedly brought against City Defendants. I have reviewed Green's Fourth Amended Complaint and conclude that no reading of Counts III, IV and X would have put City Defendants on notice that those counts were brought against them. I agree with City Defendants that only Count XVII is brought against them. In Count XVII, Green claims David Miller, Bouhasin, Slay, and the City of St. Louis conspired to deprive Green of his rights of free speech, free assembly and equal protection under the United States Constitution by prosecuting him in retaliation for exercising his constitutional rights.

Defendants David Miller and Bouhasin assert that they are entitled to absolute immunity for the prosecutorial decisions relating to filing and refiling the charges against Green. Green argues that prosecutors can be held liable where there is an egregious violation of 42 U.S.C. § 1983.

"[I]n initiating a prosecution and in presenting the State's case, the prosecutor is [absolutely] immune from a civil suit for damages under s 1983." Imbler v. Pachtman, 424 U.S. 409, 431 (1976). A prosecutor is also "absolutely immune from a civil conspiracy charge when his alleged participation in the conspiracy consists of otherwise immune acts." Reasonover, 447 F.3d at 580. Absolute immunity "does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty." Imbler, 424 U.S. at 429.

Prosecutors are only entitled to absolute immunity "when the prosecutor performs distinctly prosecutorial functions." McGhee v. Pottawattamie County, 547 F.3d 922, 933 (8th Cir. 2008). For example, absolute immunity does not apply when a prosecutor violated a person's rights by "obtaining, manufacturing, coercing and fabricating evidence *before* filing formal charges, because this is not 'a distinctively prosecutorial function.'" Id. Additionally, prosecutors do not enjoy absolute immunity when they perform administrative or investigative functions. Brodnicki v. City of Omaha, 75 F.3d 1261, 1266 (8th Cir. 1996).

In this lawsuit, Green seeks to hold David Miller and Bouhasin liable for refiling charges against him after the charges had been dismissed. Green does not claim, nor has he presented any evidence, that David Miller and Bouhasin violated

his rights while performing administrative or investigative activities. Instead, the evidence shows that David Miller issued the charges against Green, and Bouhasin decided to refile the charges after they were dismissed. The decision to file or refile charges is unquestionably "a distinctly prosecutorial function" that is "intimately associated with the judicial phase of the criminal process." McGhee, 547 F.3d at 933; Imbler 424 U.S. 430. As a result, David Miller and Bouhasin enjoy absolute immunity and are entitled to summary judgment.

Defendant Slay, in his capacity as Mayor of the City of St. Louis, argues that he is entitled to summary judgment because there is no evidence he conspired with any person to violate Green's rights. Green appears to argue that Slay is liable because he played a role in Green's prosecution. To establish a 42 U.S.C. § 1983 conspiracy claim, a plaintiff must show "(1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff," and (4) that the plaintiff was actually deprived of a constitutional right. White, 519 F.3d at 814; Askew v. Millerd, 191 F.3d 953, 957 (8th Cir. 1999). As discussed above, to establish a 42 U.S.C. § 1985(3) conspiracy claim, a plaintiff must show "(1) the existence of a civil conspiracy; (2) that the purpose of the conspiracy was to deprive her either

directly or indirectly of her civil rights; (3) that a conspirator did an act in furtherance of the object of the conspiracy; and (4) damages, shown by demonstrating either injury to the person or property or the deprivation of a civil right." Mettler, 165 F.3d at 1206.

Green has presented no evidence that Slay conspired with David Miller and Bouhasin to deprive him of his constitutional rights. Slay denies having personally communicated with David Miller or Bouhasin regarding the prosecution of Green. Slay also denies requesting that David Miller or Bouhasin refile the charges against Green after they had been dismissed. There is no evidence that Slay was aware that the Defendant Police Officers lacked probable cause to arrest Green or that the prosecutors might have lacked probable cause to prosecute Green. Bouhasin testified that he decided to refile the charges against Green based on the fact that there were witnesses that wished to testify and prosecute Green, and in Bouhasin's opinion, there were sufficient facts to pursue the charges. Whether David Miller told Reinhold that Slay wanted the charges refiled or not is immaterial because there is no evidence that Slay told David Miller to refile the charges *for the purpose* of directly or indirectly depriving Green of his civil rights. "Speculation and conjecture are not enough to prove that a conspiracy exist[ed]." Mettler, 165 F.3d at 1206. Taking the evidence in the

light most favorable to Green, there is no evidence that David Miller's decision to refile the charges against Green was part of a conspiracy to deprive Green of a constitutional right. Because there is no evidence that Slay conspired with David Miller and Bouhasin to violate Green's civil rights, Slay is entitled to judgment as a matter or law on Count XVII.

Defendant City of St. Louis argues it is entitled to judgment as a matter of law because Green has presented no evidence of an official policy or custom that would give rise to liability under <u>Monell</u>. Green argues that the City of St. Louis is liable for Slay's acts because Slay is the highest official in the city.

Green's argument is wrong as a matter of law. The doctrine of *respondeat superior* is inapplicable to suits for civil rights violations under 42 U.S.C. § 1983. <u>Id.</u> at 691; <u>Glick v. Sargent</u>, 696 F.2d 413, 414–15 (8th Cir. 1983). A municipality can only be liable for a § 1983 violation if the execution of the municipality's official policy or custom inflicts a constitutional injury. <u>Monell</u>, 436 U.S. at 694.

Green has presented no evidence of a city custom or policy to deprive individuals of their constitutional rights by conspiring to engage in malicious prosecutions. As a result, the City of St. Louis is entitled to summary judgment.

Count XVII also raises claims under 42 U.S.C. § 1981.[12] Section 1981

provides that all persons in the United States "shall have the same right in every

state and Territory to make and enforce contracts, to sue, be parties, give evidence,

and to the full and equal benefit of all laws and proceedings for the security of

persons and property as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981. In

Jett v. Dallas Independent School Dist., 491 U.S. 701, 731–36 (1989), the

Supreme Court held that 42 U.S.C. § 1983 provides the exclusive federal remedy

for violations of the rights guaranteed by § 1981. As a result, I will not perform a

separate analysis of Green's § 1981 claims.

Green also makes a claim under the Missouri common law for conspiracy,

malicious prosecution and abuse of process. Miller and Bouhasin have absolute

immunity for their prosecutorial acts under the common law. Carden v. George,

291 S.W.3d 852, 854 (Mo. Ct. App. 2009). I will therefore only address Slay's

liability. The elements of civil conspiracy under Missouri law are "(1) two or

more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4)

committed at least one act in furtherance of the conspiracy; and, (5) the plaintiff

---

[12] At the summary judgment stage, Green stated that Count XVII was brought under both 42 U.S.C. § 1983 and 42 U.S.C. § 1985. He did not claim to assert a claim under 42 U.S.C. § 1981. I will address the § 1981 claim because Green's Fourth Amendment Complaint clearly says the act was committed in violation of § 1981 as well as other violations.

was thereby damaged." Rice v. Hodapp, 919 S.W.2d 240, 245 (Mo. 1996).

"Conspiracy is not itself actionable in the absence of an underlying wrongful act or tort." Williams v. Mercantile Bank of St. Louis NA, 845 S.W.2d 78, 85 (Mo. Ct. App. 1993). "Stated another way, if no action on the case lies, no cause of action for conspiracy can be maintained." Chmieleski v. City Products Corp., 660 S.W.2d 275, 286 (Mo. Ct. App. 1983). It is therefore necessary to evaluate whether Green's underlying causes of action could be maintained against Slay.

"To succeed on a claim for malicious prosecution, the plaintiff has the burden of proving that the defendant instigated the prosecution of the underlying criminal case against him, without probable cause and with malice, which was terminated in his favor, and resulting in damages to him." Doyle v. Crane, 200 S.W.3d 581, 586 (Mo. Ct. App. 2006). "Malice" means "that the suit was intentionally initiated or continued without the honest belief that it was lawful when done." King v. Young, 304 S.W.3d 224, 227 (Mo. Ct. App. 2009). In Green's case, there is no evidence Slay intentionally initiated or continued the prosecution of Green without an honest belief that it was lawful. David Miller testified that he believed Green had been "screaming, yelling, [and] jumping up and down on tables," and he believed that amounted to peace disturbance. David Miller did not simply believe Green had engaged in verbal expression. He

believed Green was jumping up and down on tables. Even if Slay did tell David Miller and Bouhasin to refile the charges against Green, there is no evidence Slay lacked an honest belief that the charges were without probable cause. As a result, I will grant Slay, as Mayor of the City of St. Louis, summary judgment on Green's claim of malicious prosecution and for conspiracy to do so.

"[A]buse of process is different from malicious prosecution." Moffett v. Commerce Trust Co., 283 S.W.2d 591, 599 (Mo. 1955). "The elements of an abuse of process claim are (1) the present defendant made an improper, illegal, perverted use of process, which use was neither warranted nor authorized by the process; (2) the defendant had an illegal purpose in doing so; and (3) damage resulted." Crow v. Crawford & Co., 259 S.W.3d 104, 116 (Mo. Ct. App. 2008). The defendant must have acted willfully and had some ulterior purpose in the improper use of process, which can be inferred from the wrongful use of process. Id. Green has not presented evidence that Slay or the prosecutors made an improper, illegal or perverted use of process. After the charges of Green were dismissed, Bouhasin reinstated them. David Miller testified that during his tenure with the city, he had refiled charges in cases other than Green's. Even if Slay ordered the charges against Green reinstated, there is no evidence that was improper or illegal. As a result, I will grant Slay, as Mayor of the City of St.

Louis, summary judgment on Green's claim of abuse of process and for conspiracy to do so.

### F. Claims against Craig Hebrank, Daniel Sweeney, and Byron Willis

Rule 4(m) of the Federal Rules of Civil procedure provides, "If a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice or order that service be made within a specified time." An individual may be served by

> (1) following state law for serving a summons . . . or
> (2) doing any of the following:
> > (A) delivering a copy of the summons and of the complaint to the individual;
> > (B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or
> > (C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Fed. R. Civ. P. 4(e). Missouri state law permits service of process

> by delivering a copy of the summons and petition personally to the individual or by leaving a copy of the summons and petition at the individual's dwelling house or usual place of abode with some person of the individual's family over the age of fifteen years, or by delivering a copy of the summons and petition to an agent authorized by appointment or required by law to receive service of process.

Mo. R. Civ. P. 54.13.

### 1.    *Hebrank*

On March 25, 2010,  I informed Green that Hebrank had never filed an answer to his complaint and that no one entered his or her appearance.  I ordered Green to show cause why Hebrank should not be dismissed because it appeared that the November 21, 2007 service was ineffective in that did not comply with Fed. R. Civ. P. 4(e).  Green responded to the Show Cause Order by submitting evidence that on February 27, 2007, Green personally served Defendant Craig Hebrank with notice of this lawsuit at his home.  Green's process server submitted an affidavit that after Hebrank answered the door and acknowledged he was Craig Hebrank, the process server personally handed the summons to him.  For reasons unknown to the process server, he was asked to serve Hebrank again, and he did so on November 21, 2007 by leaving the summons at the Cottleville police station. Because the record establishes that the February 27, 2007 service complied with Fed. R. Civ. P. 4(e), I will not dismiss Hebrank for lack of service.

A district court may dismiss a claim *sua sponte* under Fed. R. Civ. P. 41(b) for failure to prosecute.  See Sketon v. Henry, 390 F.3d 614 (8th Cir. 2004) (affirming district court's *sua sponte* dismissal for failure to prosecute); see also Link v. Wabash R.R. Co., 370 U.S. 626, 630–31 (1962) (courts have inherent

authority to dismiss *sua sponte* for failure to prosecute).  Hebrank's answer was due on March 19, 2007.  Although Hebrank's answer was due more than three years ago, Green never moved for entry of default or for default judgment.  Even after I notified Green on March 25, 2010 that Hebrank had failed to answer, Green chose not to move for entry of default or default judgment.  Green is aware that this case has been pending since 2006 and is at the dispositive motion stage, yet he has decided not to move for default against Hebrank.  Because Green has failed to prosecute his claims against Hebrank for more than three years, I will dismiss all claims against Hebrank with prejudice.

2. *Willis and Sweeney*

On November 21, 2007, summons were purportedly executed on Daniel Sweeney and Byron Willis, both of whom were sued in their individual capacities and official capacities as officers or supervisors of the St. Louis Police Department.  The return for Byron Willis states, "Left Copies at Centra [sic] Bureua [sic], St. Louis Police Dept."  The return for Daniel Sweeney states, "Left copies at Defendant's work, Central Detective Bureau, St. Louis Police Dept."  Neither Sweeney or Willis filed an answer, and no one entered his or her appearance to represent them.

Service can be effectuated by delivering a copy of each to an agent authorized by appointment or by law to receive service of process. Fed. R. Civ. P. 4(e)(2)(C); Mo. R. Civ. P. 54.13. The issue here is whether Green has provided sufficient evidence that the unnamed person at the Central Detective Bureau is an agent authorized by appointment or by law to receive service of process for Willis and Sweeney. Because there was no evidence in the record that the unnamed agent was authorized to accept service of process and it appeared that service on those defendants was ineffective for failing to comply with Fed. R. Civ. P. 4(e), on March 25, 2010, I ordered Green to show cause why they should not be dismissed for lack of service. In response, Green provided the affidavit of his process server that states he "had been repeatedly told that the person that received the summons in the case of Willis and Sweeney that that person had authority to receive for these present employees and officers who were in good standing as officers and that they did not want me to personally approach them to serve them on the job or in public nor at their respective homes as their addresses were not intended for security reasons to be publicly known. I knew this was the procedure also because I had been in prior years a police officer myself." I find this statement by Green's process server insufficient to establish that the unnamed individual was authorized to accept service for Willis and Sweeney. Green has failed to provide any

evidence that Willis and Sweeney appointed the unnamed individual to accept service for them and has failed to cite any statute or ordinance that authorized the unnamed individual to receive service for Willis and Green. As a result, I will dismiss without prejudice all claims against Willis and Sweeney for lack of service in this matter. Even if service were valid, I would dismiss all claims against Willis and Sweeney for failure to prosecute.

### *Conclusion*

I will grant summary judgment to all parties on Green's Fourth Amendment claims, Fifth Amendment claims, Eighth Amendment claims, Thirteenth Amendment claims, his claims under 42 U.S.C. § 1982, Green's false imprisonment and false arrest claims. I will dismiss without prejudice Green's Fourteenth Amendment Privileges and Immunities Clause claims against all parties for failure to state a claim.

I will grant summary judgment to Peek, Regan, Doetzel, Podolak, Griffin, Knox, Quinn, Freeman Morrow, Hunter, Goodson, and Slay, as current or former members of the St. Louis Board of Police Commissioners, Mokwa, Nocchiero, David Miller, Bouhasin, Slay, as Mayor of the City of St. Louis, and the City of St. Louis summary judgment on all claims made against them. I will also grant the

Special Administrative Board of the Transitional School District of the City of St. Louis summary judgment on all claims made against it.

I will dismiss with prejudice all claims against Craig Hebrank for failure to prosecute, and I will dismiss without prejudice the claims against Byron Willis and Daniel Sweeney.

In short, the only claims remaining are Green's First Amendment retaliation claim, 42 U.S.C. § 1981 claim, and 42 U.S.C. § 1985 conspiracy claim against McCrary and Kestner Miller.

Accordingly,

**IT IS HEREBY ORDERED** that Green's Fourteenth Amendment Privileges and Immunities claims against all defendants are **DISMISSED without prejudice**.

**IT IS FURTHER ORDERED** that all claims against Defendants Byron Willis and Daniel Sweeney are **DISMISSED without prejudice**.

**IT IS FURTHER ORDERED** that the claims against Defendant Craig Hebrank are **DISMISSED with prejudice**.

**IT IS FURTHER ORDERED** that Defendants Michael Quinn, JoAnn Freeman Morrow, Julius Hunter, Chris Goodson, and Francis Slay, in his capacity as member of the St. Louis Board of Police Commissioners, Paul Nocchiero,

Joseph Mokwa, David Doetzel, Michael Regan, Andrew Griffin, Daniel Peek, John Podolak, and Brent Knox's motion for summary judgment [#248] is **GRANTED**.

    **IT IS FURTHER ORDERED** that Defendants Charles McCrary, Kestner Miller, and the Special Administrative Board of the Transitional School District of the City of St. Louis's motion for summary judgment [#245] is **GRANTED in part and DENIED in part**.

    **IT IS FURTHER ORDERED** that Defendants David Miller, John Bouhasin, Francis Slay, as Mayor of the City of St. Louis, and City of St. Louis's motion for summary judgment [#238] is **GRANTED**.

    Dated this 17th Day of August, 2010.

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE